UNITED STATES DISTICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

FILED
MAY 07 2024
CLERK, U.S. DISTRICT CLERK
WESTERN DISTRICT OF TEXAS
BY_____ DEPUTY

SCOTT ZIRUS, §
Individually and on behalf of all §
others similarly situated. §
§
PLAINTIFF, §
§
V. § CIVIL ACTION No. 1:24CV00507 RP
§
PATRICK O'DANIEL, §
Chairperson of the Texas Board of §
Criminal Justice; §
§
BRYAN COLLIER, §
Executive Director of the Texas §
Department of Criminal Justice; §
§
BOBBY LUMPKIN, §
Director of the Correctional §
Institutions Division of the §
Texas Department of Criminal §
Justice. §
§
In his OFFICIAL CAPACITY. §
§
DEFENDANTS. §

## ORIGINAL COMPLAINT

1. This is a civil action authorized by 42 U.S.C. 1983 to redress the deprivation, under color of state law, of rights secured by the Constitution of the United States. The Court has jurisdiction under 28 U.S.C. 1331 and 1343(a)(3). Plaintiff seeks declaratory relief pursuant to 28 U.S.C. 2201 and 2202. Plaintiffs claims for injunctive relief are authorized by 28 U.S.C. 2283 & 2284, and Rule 65 of the Federal Rules of Civil Procedure.

2. The Western District of Texas, Austin Division, is the appropriate venue under 28 U.S.C. 1391(b)1) and (2) because it is where the Texas Board of Criminal Justice and Plaintiff O'Daniel reside and where the events or omissions giving rise to the claims occurred.

3. Under 1391(b)(1), a civil action governed by the general statute may be brought in a jurisdiction in which any defendant resides, if all defendants are residents of the State in which the district is located.

4. All Defendants named in this suit reside in Texas.

5. Defendant O'Daniel is the most senior Defendant and he physically resides Leander, Williamson County, which is in the jurisdiction of the Western District of Texas, Austin Division.

6. Furthermore, the "residence" of a public official sued in their official capacity is the place where they perform their official duties. Pursuant to Tex. Gov. Code 492.014(a), the Texas Board of Criminal Justice "shall maintain headquarters in Austin". Thus, for all practical purposes, this renders Austin the "residence" of the TBCJ.

7. Under 1391(b)(2), the appropriate venue is where the alleged events or omissions giving rise to the Plaintiffs claims occurred.

8. Plaintiff alleges that the TBCJ, with deliberate indifference, have failed to exercise their policymaking responsibilities and authority to cure the unconstitutional heat conditions within TDCJ. Such an omission forms the crux of the unconstitutional conditions.
Therefore, Austin in the locus of the substantial part of the events or <u>omission</u> on which the claims are based.

9. Plaintiff has not named any official from the Robertson Unit where he is currently incarcerated, because said officials have no authority or ability to cure the unconstitutional conditions. Thus, Plaintiff asserts that the Northern District of Texas, Abilene Division, is NOT the appropriate venue for this suit.

## PLAINTIFF

10. Plaintiff Scott Zirus is and was at all times mentioned herein a prisoner of the State of Texas in the custody of the Texas Department of Criminal Justice. His postal address is: Scott Zirus #01640002, Robertson Unit, 12071 F.M. 3522, Abilene, Texas 79601.

## DEFENDANTS

11. Defendant Patrick O'Daniel is the Chairperson of the Texas Board of Criminal justice and is legally responsible for the creation of policy for the Texas Department of Criminal Justice. He is legally responsible for the oversight of the TDCJ and for the welfare of all Residents in the TDCJ. His postal address is: Texas Board of Criminal Justice, P.O. Box 13084, Austin, Texas 78711.

12. Defendant Bryan Collier is the Executive Director of the Texas Department of Criminal Justice. He is legally responsible for providing safe and appropriate confinement, supervision, rehabilitation and reintegration of TDCJ Residents, and to effectively manage or administer facilities based on Constitutional and statutory standards. His postal address is: P.O. Box 99, Huntsville, Texas 77342-0099.

13. Defendant Bobby Lumpkin is the Director of the Correctional Institutions Division of the Texas Department of Criminal Justice. He is legally responsible for providing safe and appropriate confinement, supervision, rehabilitation and reintegration of TDCJ Residents, and to effectively manage or administer facilities based on Constitutional and statutory standards. His postal address is: P.O. Box 99, Huntsville, Texas 77342-0099.

14. Each Defendant is sued in his OFFICIAL CAPACITY. At all times mentioned in this Complaint, each Defendant acted under the color of state law.

## FACTS

15. This civil suit is challenging the inhumane and unconstitutional heat conditions in the Texas Department of Criminal Justice.

16. Incarcerated Residents of the TDCJ are HUMAN. Because they are human, they are inherently susceptable to all limitations and ailments as all other humans - including exposure to extreme temperatures. For example, at 100°F heatstroke becomes imminent for those in good health. This is true whether or not that person in incarcerated or free.

17. It is indisputable that Texas is a state prone to extreme temperatures and drought. In mid-August 2022, 97% of Texas was experiencing either the first or second most severe category of drought. According to the Climate Impact Lab, temperatures in the Texas summer months average over 74 days over 95°F. By 2036, there will be nearly twice as many 100°F days as they are today.

18. These extreme temperatures during the Texas summer are not unique to any one specific location in Texas.

19. FOR EXAMPLE, in Dalhart, Texas (where TDCJ's most northern unit is located) there was 56 days over 93°F, 16 days over 100°F and a high of 105°F in the summer of 2023.

20. FOR EXAMPLE, in Abilene, Texas, there was 65 days over 100°F, 51 days over 103°F, 33 days over 105°F, 27 days over 106°F and 14 days over 108°F during the summer of 2023. In fact, there was 50 consecutive days where the maximum temperature exceeded 97°F (8th July through 26th August 2023). Of those 50 days, 45 days were over 100°F, 24 days over 105°F, 19 over 106°F, 12 over 108°F and the maximum reaching 111°F on 17th August 2023.

21. The National Centers for Environmental Information provides publically available data on the temperatures throughout the nation - including Texas. This data shows that the locations where TDCJ has non-climate controlled units experience the same or greater temperature extremes as the two examples above. This data is available at:

    www.ncdc.noaa.gov/cdo_web/datasets/LCF/stations/...

22. Within the TDCJ there are currently 70 units/facilities that are not fully air-conditioned and thus have no way to keep temperatures at humane levels. 49 of the 70 units are partially air-conditioned (which means that some areas housing TDCJ Residents have climate control while others do not), while the remaining 21 units have no air-conditioning at all. This constitutes a collective 107,295 TDCJ beds where Residents are exposed to extreme temperatures in their housing areas without the means to meaningfully and safely regulate the temperatures.

23. There are more beds in TDCJ without climate control than the entire population of incarcerated people in Alabama, Arkansas, Georgia, and New Mexico combined. See, National Prisoner Statistics Program, Bureau of Justice Statistics (BJS), U.S. Dept. Justice, 2019.

24. Plaintiff asserts that because the mitigation measures implemented by TDCJ are ineffective (and in some cases dangerous) to reduce exposure to excessive heat to constitutionally acceptable levels, and the evident increasing annual temperatures of days over 100°F in Texas, this issue is being exasperated and there will be an increased degraduation of health for both incarcerated Residents and TDCJ staff without the installation of universal climate control.

25. TDCJ Policy is designed to merely mitigte the effects of heat exposure rather than actually prevent the conditions that place its Residents at serious risk to harm or death by extreme temperatures.

26. Despite these heat mitigation policies, nearly every year, there are reports of TDCJ Residents and staff falling extremely ill and/or dying from extreme heat.

27. The Texas legislature has required the Texas Board of Criminal Justice (To wit, Defendant O'Daniel) and the TDCJ Executive Director (To wit, Defendant Collier) to publish a report on the monitoring of temperatures and temperature-related deaths in TDCJ every year. See, General Appropriations Act Rider 56.

28. This GAA Rider 56 shows that the Texas legislature holds both the TBCJ and the Executive Director to be legally responsible over the heat conditions in TDCJ.

29. Plaintiff asserts that upon belief and information, the Defendants have not been accurately recording the deaths by heat in TDCJ.

30. Based upon the facts stated below, Plaintiff asserts that current heat mitigation policies and practices do NOT result in adequate protection against heat-related illness or death for TDCJ Residents, yet alone prevent the conditions that cause such. In some instances, the mitigation actually aggravate the risks of serious harm by extreme heat.

31. Extreme heat makes it difficult for the human body to properly regulate its temperature thereby leading to illnesses including cramps, heat stroke, heat exhaustion and hyperthermia. See, National Integrated Heat Health Information System. 2022. "Extreme heat"; CDC. 2017 "About Extreme Heat".

32. Heat stroke is the most serious heat-related illness. It occurs when the body becomes unable to control its temperature: the body's temperature rises rapidly, the sweating mechanism fails, and the body is unable to cool down. When heat stroke occurs, the body temperature can rise to 106°F or higher within 10 to 15 minutes. Heat stroke can cause death or permanent disability if emergency treatment is not given. See, CDC, 2018. "Heat Related Illnesses" <http://www.cdc.gov/noish/topics/heatstress/heatrelillness.html>.

33. According to TDCJ, "a person can begin to feel the effects of heat exhaustion in temperatures as low as 80 degrees" and that "risks for heat stroke begin at temperatures of 91 degrees", while at 95 degrees "there can be imminent danger of developing heat stroke". See, "TDCJ Risk Management's Training Circular". Risk Management Issues. 14(5): 1-4 <Https://www.tdcj.texas.gov/documents/training_circular/Training_Circular_2014-05.pdf>

34. Research has also shown a relationship between hot tempatures and increased aggression. This heat-influenced aggression could lead to violence and even homicide within the prison environment, as well as the increased reporting of use of force incidents by TDCJ staff against Residents (who are also suseptable to aggression influenced by heat).

35. Research also shows a relationship between extreme heat and even access to daylight (two particularly relevant conditions in Texas prisons) have been shown to increase the likelihood of self-harm and suicide.

-6-

36. According to an information request made by the Texas Prisons Community Advocates (TPCA) to TDCJ, at least 1,391 Residents of TDCJ were documented as having attempted suicide in 2019 and 35 Residents died by suicide. In 2020, the number of Residents who died by suicide increased to 50 and this number has been increasing ever since.

37. The primary heat mitigation measure within TDCJ is the use of electronic fans in the absence of climate control on TDCJ units.

38. A "Whirlwind" personal fan is available to Residents through the unit commissary. Stationary industrial fans are mounted in each dayroom on the unit.

39. Although such fans are commonly used in environments without access to climate control, there are compelling reasons NOT to use them when temperatures reach above 95°F. Numerous health organizations and studies have described the dangers of relying on electric fans to mitigate the risk of heat related illness.

40. The U.S. Environmental Protestion Agency (EPA) has reported that unless a fan is circulating cooled air from another source, fans can likely increase the circulation of hot air leading to increased sweat evaporation which can speed the onset of heat-attributable conditions such as heat exhaustion. See, EPA. 2016. "Excessive heat Events Guidebook" <https://www.epa.gov/sites/default/files/2016-03/documents/eheguide_final.pdf>

41. The World Meteorlogical Organization (WMO) and the World Health organization (WHO) has explained that: "fans do not actually cool the air... when the weather is very hot and dry, using a fan alone when body core temperatures exceed 38°C [100.4°F] actually increases heat stress, because of the limits of conduction and convesction. When the temperature is more than 35°C [95°F] and the relative humidity is 100 per cent, air movement can make an individual hotter. Thus, fans should be discouraged unless they are bringing in significantly cooled air". See, <https://www.who.int/globalchange/publications.WMO_WHO_Health_Health_Guidance_2015.pdf>

-7-

42. Electric fans are thus a counterproductive and dangerous heat mitigation measure when TDCJ Residents are exposed to extreme temperatures. Yet the Whirlwind fans are the ONLY direct heat mitigation available when TDCJ Residents are confined in their cells either at night time, lockdown or because of short staffing (which is an increasingly common occurance due to the historically low levels of staff on TDCJ units).

43. The general scientific and medical consensus is that even if fans are consistently accessible to all TDCJ Residents, fans cannot prevent heat illness or death without the introduction of cooled air, and will actually increase the chance of heat illness by circulating hot air.

44. Under conditions of excessive heat, TDCJ Policy (AD-10.64) directs that TDCJ residents are to have access to water along with ice in the housing areas, recreation areas, and during meal times.

45. TDCJ distributes water communally in common areas (i.e. dayrooms) through the use of water coolers. These coolers are refilled intermittenly and refills are dependant upon available staff. As such, the issue of crowded conditions and low levels of staffing have serious impacts on TDCJ Residents access to water.

46. TDCJ Residents have absolutely no access to cool water when confined in their cells. The only available water source is the water faucet connected to the toilet. This water is not regulated and is often at room temperature. Although TDCJ policy dictates that staff are to distribute cool water to each cell when the unit is on any kind of lockdown, due to short staffing issues that are systemic throughout TDCJ, this is impractical and not a sufficient way to ensure that TDCJ Residents are provided adequate cool water during extreme heat.

47. Access to cool water should be provided regardless of temperatures, but without climte control, lack of access becomes an issue of life and death.

48. "Respite Areas" are also a mitigation measure that is ineffective. These are designated areas with air-conditioning that a TDCJ Resident may, in theory, access if they are feeling ill or distress from excessive temperatures.

49. The primary issue accessing "Respite Areas" comes from the inherent fact that TDCJ Residents are not able to walk freely throughout the facility and therefore require an escort or security oversight in order to access the respite areas. This is viewed by staff as a significant hassle, and subsequently creates tension and outright hostility. This is increasingly the case because of the historically low levels of stff at TDCJ units and the innate logistical challenges this creates.

50. TDCJ Residents also report being denied access to respite unless the staff believed that they were experiencing heat-related illness or on the official list of those Residents with medical heat restrictions.

51. Respite areas are not an adequate plan to deal with the heat risk precisely because they are only temporary and so the time the Residents are not in air-conditioning, they are subjected to the temperatures which are a substantial risk to the Residents health and life.

52. Furthermore, harmful effects of excessive heat can begin to occur BEFORE an individual might feel the need to go to an air-conditioned space. because the Resident must take the initiative to go to a respite area, they may not know they are in imminent danger until it is too late.

53. Respite Areas are not an adequate mitigation measure to prevent the substantial risk of harm caused by excessive heat.

54. TDCJ heat mitigation measures also allow for "additional cooled showers".

55. During the Pack Unit litigation, Expert testimony established that taking extra showers did not reduce the health risks of extreme heat to a significant degree and that while showers may be helpful for the short term, giving a person shower and then putting them back into a very hot, humid environment has limited effect.

56. There are a handful of building styles for units within TDCJ. However most (if not all) are constructed of steel and concrete which has a relatively slow thermal response compared with the outdoor air. Therefore, the building mass temperature becomes increasingly hot as the day progresses and subsequently retains that heat throughout the majority of the night.

57. Although the outdoor temperature at night may fall below the building mass temperature and thus pull some warm air from the building, it rarely has the opportunity to equalize with the outside air temperature before the sun rises and the building begins to heat once again without actually cooling off.

58. Plaintiff asserts that all three Defendants have, with deliberate indifference, exposed all TDCJ Residents housed in non-climate controlled housing, to an ongoing condition that poses an unreasonable risk of serious damage to their present welfare and life, as well as their future health.

59. The current heat mitigation measures are ineffective to reduce the substanial risk of serious harm to a constitutionally acceptable level.

60. Defendants absolute reliance upon these inadequate and ineffective heat mitigation measures, pose a danger tht is so obvious that Defendants must either know about it or be purposefully disregarding it.

61. The extensive litigation surrounding extreme heat and the measures taken by Defendants to mitigate such, shows that Defendants fully understand the substanial risk to TDCJ Residents health and safety posed by the conditions caused by extreme heat.

62. Plaintiff asserts that this Court has subject-matter jurisdiction over Defendant O'Daniel in his official capacity for the following reasons.

63. Tex. Gov. Code 492.013(e) states: "The board shall develope and implement policies that clearly separate the policymaking responsibilities of the board and the management responsibilities of the executive director and the staff of the department" Therefore, TBCJ has the statutory "policymaking responsibilities" and the executive director has "management responsibilities". This statute also mandates that these responsibilities "SHALL" be "clearly separate".

64. Tex. Gov. Code 492.001 states: "The board govens the department". This means that although the executive director has administrative or management responsibilities, the TBCJ retains control and authority over the fundamental operation of the Texas Department of Criminal Justice. It thus has the statutory obligation to ensure that the department operates at a constitutionally sufficient level. Deliberate failure to do so renders TBCJ liable and infers subject-matter jurisdiction over TBCJ members in their official capacity.

65. This argument is further supported by the fact the Texas Legislature requires the TBCJ to publish an annual report on the monitoring of temperatures and heat related deaths in TDCJ. Logic dictates that if the TBCJ did not have any responsibility or authority to cure the excessive heat conditions of TDCJ the Texas Legislature would not require such a report from them.

66. As the Chairperson of the TBCJ, this Court has subject-matter jurisdiction over Defendant O'Daniel.

67. Plaintiff has fully exhausted all administrative remedies for all issues and claims presented in this suit. See, Grievance Numbers 2022058396; 2022108933; 2024080579.

## LEGAL CLAIMS

68. Excessive heat constitutes a condition that poses a substantial risk of serious harm to the health of all human beings - irrespective of their status in society (i.e. an incarcerated person).

69. Plaintiff asserts that there is copious evidence of the effects that such high temperatures have on the welfare of both healthy individuals and individuals with heat sensitivity.

70. Plaintiff asserts that the heat mitigation measures employed by Defendants are constitutionally deficient and ineffective in reducing the serious risk posed by extreme heat to an adequate level.

71. The failures of these heat mitigation measures are inherent in their nature and are not isolated failures specific to any non-climate controlled unit. They are systemic.

72. Plaintiff contends that because the heat mitigation measures are ineffective that the only meaningful way to constitutionally protest TDCJ Residents from the serious risks of excessive heat is the installation of climate control.

73. The extreme conditions constitute wanton and unnecessary infliction of pain and suffering.

74. Society considers the challenged conditions of extreme heat to be so grave that it violates contemporary standards of decency to expose anyone unwillingly to such high levels of heat - even incarcerated people.

75. Defendants have, with deliberate indifference, exposed all TDCJ Residents housed at the 70 units that do not have climate control, to conditions that pose an unreasonable risk of serious damage to their current and future health. Defendants are aware of facts from which the inference could be drawn that a substantial risk of serious harm exists. Defendants actions and admissions show they have drawn that inference but have failed to respond reasonably by preventing the conditions that expose TDCJ Residents to excessive heat.

76. Plaintiff has no plain, adequate, or complete remedy at law to redress the wrongs described herein. Plaintiffs have been and will continue to be irreparably injured by the conduct of the Defendants unless this Court grants declratory and injunctive relief which Plaintiff seeks.

PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays that this Court enter judgment:

77. Granting Plaintiff a DECLARATION that the acts and omissions described herein violate his rights under the Constitution and laws of the United States.

78. Remedy ongoing violation of the law and the Constitution by granting INJUNCTIVE relief to resolve the unconstitutional heat conditions in TDCJ. If amended mitigation measures prove ineffective, Plaintiff requests that injunctive relief include the establishment of a heat-index between 65°-85°F inside all housing areas and the instalation of climate control.

79. Award Plaintiff reasonable attorney fees and costs of this action pursuant to 42 U.S.C. 1988.

80. Plaintiff seeks a jury trial on all issues triable by jury.

81. Award such other and further relief as this Court may deem necessary.

Respectfully Submitted,

DATE: 18th April 2024

Scott Zirus
TDCJ No. 01640002
Robertson Unit
12071 F.M. 3522
Abilene, Texas 79601

## VERIFICATION

I have read the foregoing Original Complaint and hereby verify that the matters alleged therein are true, except as to matters alleged on information and belief, and, as to those, I believe them to be true. I certify under penality of perjury that the foregoing is true and correct.

EXECUTED at Abilene, Texas on this the 18th day of April, 2024.

Scott Zirus, Plaintiff pro se.